311 Ga. 225
FINAL COPY


S21A0044. DAVIS v. THE STATE.


WARREN, Justice.

Zemartae Jebra Davis was convicted of felony murder and possession of a knife during the commission of a crime in connection with the stabbing death of Dontravious Hoskins.[1] On appeal, Davis contends that the trial court erred when it admitted the prior testimony of an absent witness, and that his trial counsel was

---

[1] The crimes occurred on September 17, 2013. A Richmond County grand jury indicted Davis for one count of malice murder, one count of felony murder predicated on aggravated assault, and one count of possession of a knife during the commission of a crime. Davis was tried from September 9 to 11, 2015, and a jury found him guilty of felony murder and possession of a knife during the commission of a crime, but not guilty of malice murder. The trial court imposed consecutive sentences of life in prison for felony murder and five years for the possession of a knife during the commission of a crime. On October 8, 2015, Davis filed a motion for new trial. Trial counsel later withdrew from representing Davis, and on September 26, 2018, Davis filed an amended motion for new trial through appellate counsel. After a hearing, the trial court denied the motion for new trial, as amended, on October 15, 2018. Davis timely filed a notice of appeal on November 13, 2018, and the case was docketed in this Court to the term beginning in December 2020 and submitted for a decision on the briefs.

constitutionally ineffective for failing to object to the admission of that testimony. For the reasons that follow, we disagree and affirm Davis's convictions.

1. The evidence presented at Davis's trial showed the following.[2] In September 2013, Davis, a 15-year-old high school freshman, and his friend, Makale Jones, decided to make some money by selling a PlayStation 3 videogame console, which Makale shared with his older brother, Trey Jones. The pair sold the PlayStation to Hoskins—an 18-year-old who lived in the area and who was friends with both Davis and the Joneses. According to Davis, who testified at trial, the boys agreed on a price of $125, and Hoskins paid $50 upfront and took possession of the game system, agreeing to pay the remaining $75 later. Davis and Makale agreed to split the money, even though Davis did not own the PlayStation.

At trial, Makale testified that about a week after selling the

---

[2] This case was docketed to the term of court that began in December 2020, and Davis does not raise the sufficiency of the evidence on appeal. Therefore, under *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020), we do not consider sufficiency of the evidence sua sponte.

PlayStation to Hoskins, Davis called Makale to tell him that Hoskins was refusing to pay the remaining money he owed. Makale responded that he and Davis needed to get the game system back if Hoskins would not pay because Makale was not supposed to sell the game system and he "didn't tell my folks that I sold [it]." The two then met up and began walking toward Davis's relative's house, where Davis was living at the time. That day, Hoskins was at the house hanging out with Dominique Harris, Davis's cousin who also lived there. As Davis and Makale continued to the house, they picked up Trey, who was upset that Makale sold the PlayStation and wanted to get it back. At some point on the walk over, Makale dropped out of the group, but Trey and Davis continued toward the house to confront Hoskins.

When the two arrived at Davis's house, they entered a room where Harris and Hoskins were sitting. Davis was angry and confronted Hoskins about the PlayStation, but Hoskins emphatically refused to pay Davis any additional money or return the game system. After the two argued for a bit, Harris told Davis

3

and Hoskins to take the argument outside.

At trial, Davis testified that on his way outside, he grabbed two knives from the kitchen "[b]ecause I was afraid and I know [Hoskins] was going to hurt me pretty bad . . . [b]ecause [Hoskins] was way bigger than me at the time." Davis testified further that his goal was to "[s]care him and he probably be like 'I'm not going to fight him.'" Davis's counsel elicited testimony from multiple witnesses, including Davis, about the size difference between Davis and Hoskins: Davis was around 5′ 6″ tall and weighed 117 pounds. Hoskins was 6 feet tall and 178 pounds. Harris testified that during the argument, Hoskins referred to Davis as "just a kid."

Several witnesses testified about hearing Hoskins threaten to kill Davis by remarking that Davis would not want his family to have to wear "black and white." Davis testified that he understood this statement as a threat to kill him, "[b]ecause that's what you wear to a funeral. You wear black and white." But no witnesses who testified in person at trial, other than Davis himself, said they saw Hoskins act aggressively toward Davis.

4

Hoskins and Davis continued arguing outside the house, and at some point during the altercation, Davis stabbed Hoskins. Although no witnesses at trial, other than Davis, claimed to have seen the actual moment when Davis stabbed Hoskins, multiple witnesses testified that immediately after the stabbing, they saw Hoskins holding his side as he left the scene of the altercation. Hoskins then stumbled down the street and eventually collapsed in the road. Harris took Hoskins to a nearby fire station; emergency service workers then took Hoskins to the hospital, where he died. An autopsy revealed that Hoskins had a stab wound in his chest, so deep that it reached all the way to his heart.

Sandra Savage, a neighbor who was sitting in her house with the front door open at the time of the altercation, testified that she saw three "kids" in her front yard, including Hoskins, and two people she described as "a guy with dreads" and a "younger guy." Savage testified that the "guy with dreads" told the "younger guy" that "'you have already stabbed him or cut him, let it go.' And the younger guy made a statement . . . 'don't nobody steal from me or take from me'

or something and they went back and forth."

Investigators found a trail of blood on the road that showed Hoskins's path away from the scene and recovered a bloody knife from the area. Hoskins's DNA was later found on the bloody knife, and Hoskins's black t-shirt, recovered from the hospital, appeared to have been cut by a sharp object.

Davis's account of the incident included some additional details. In support of the self-defense theory he offered at trial,[3] Davis testified that he first pulled out a knife and warned Hoskins, "don't make me use it," but that Hoskins "wasn't scared." According to Davis, Hoskins then "came towards me and I didn't try to stab him or nothing. It was just in my hand. And I guess he came onto the knife." Davis denied swinging the knife or actively cutting Hoskins in any way. Afterward, Davis fled on foot, was spotted by law enforcement officers at the football field of a nearby elementary

---

[3] We note that the record on appeal does not contain transcripts of opening statements or closing arguments from trial. But based on the trial transcripts, which show that the jury was instructed on self-defense, as well as trial counsel's testimony at the hearing on Davis's motion for new trial, it appears that Davis raised a theory of self-defense at trial.

school, and was taken into custody after a brief pursuit.

At trial, the State initially intended to call Trey Jones as a witness. But on the first day of trial, the prosecutor informed the trial court that Trey likely would not appear:

> Your Honor, I was just informed by Trey Jones'[s] father that he is not here despite being under subpoena. I actually served him with a subpoena for today on last Monday. That does present a problem, it appears that he was scheduled to be in court for his own case on Thursday of last week and didn't show for that. There may be an active bench warrant for him for that.

The prosecutor argued that Trey's sworn testimony at the preliminary hearing in this case should be admitted under the prior testimony hearsay exception in OCGA § 24-8-804 (b) (1) ("Rule 804 (b) (1)") (providing an exception to the hearsay rule when the declarant is both unavailable and gave previous testimony "as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination"). Specifically, in light of his father's statement and Trey's failure to respond to the subpoena or to show

7

up for his own hearing the week before, the prosecutor argued that Trey was "unavailable" and that Davis had an opportunity and similar motive to develop Trey's testimony at the preliminary hearing because Davis called Trey as a witness and Davis's counsel examined him under oath.

In response, Davis's trial counsel agreed with the prosecutor's Rule 804 analysis, remarking "[s]he's right, Judge," and asking "that [Trey's] entire testimony at the preliminary hearing be admitted." After a back-and-forth with the prosecutor, the trial judge ruled that "it would be my inclination if he is not present at the time the State seeks to call him . . . to allow the sworn testimony given at the preliminary hearing."

The trial progressed, and Makale later testified that "[n]obody knows" where Trey went and that Trey had not been staying at his parent's house "since [Trey] had a warrant." Right after Makale left the witness stand, the State announced that it intended to read a transcript of Trey's previous testimony into evidence, and the trial

court allowed the State to proceed.[4]  The State did not formally call Trey as a witness before it began reading his testimony into the record.  Davis's trial counsel did not object, but did ask the court to instruct the jury as to what was about to take place.

Trey's testimony from the preliminary hearing included some new evidence and some that corroborated the testimony of other witnesses.  First, Trey testified that he saw Davis put his finger — or possibly his hand — to Hoskins's face and that Davis "probably touched [Hoskins]."  Second, Trey testified that at the moment of the stabbing, "[Hoskins] did run up and try to grab [Davis]."  Third, Trey testified that after the stabbing occurred, Hoskins "turned around and said, 'you stab[bed] me,' and then ran up the street."[5]  At the end of the three-day trial, a jury found Davis guilty of felony murder and possession of a knife during the commission of a crime, and not

---

[4] On September 28, 2015, 17 days after the trial ended, the trial court issued an order concluding that Trey was unavailable under OCGA § 24-8-804 (a) (5) ("Rule 804 (a) (5)").

[5] Later in the trial, Harris testified on cross-examination that he also heard Hoskins say "you stabbed me."

guilty of malice murder.

After he was convicted, Davis filed and later amended a motion for new trial, in which he contended, among other things, that the trial court erred in admitting Trey's previous testimony and that trial counsel was constitutionally ineffective for failing to object when the State sought to introduce it. At the hearing on the motion, Davis's trial counsel testified on direct examination that he had no strategic reason for failing to object when the State sought to introduce Trey's previous testimony into evidence; he "[j]ust didn't think to do it." But on cross-examination, he conceded that "Trey Jones was important to demonstrate that . . . the victim went toward [Davis] in a quick fashion"; that Trey's testimony was consistent, "[i]n most aspects," with Davis's theory of the case, including that "[Davis] had the right to defend himself"; and that Davis had "reason to believe that he needed to defend himself." Trial counsel added that he "needed" Trey's testimony insofar as it showed "[t]hat the victim went after [Davis]."

2. Davis contends that the trial court abused its discretion

10

when it admitted Trey Jones's prior testimony into evidence under Rule 804 because it failed to conduct a proper inquiry into Trey's availability under Rule 804 (a) (5). See OCGA § 24-8-804 (a) (5) ("As used in this Code section, the term 'unavailable as a witness' includes situations in which the declarant . . . [i]s absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."). Specifically, Davis argues that the State failed to show that Trey was "unavailable as a witness" when he was scheduled to testify — as opposed to at the beginning of the trial when the State represented that Trey was likely unavailable — and that the trial court should have, at the very least, required the State to call Trey as a witness and establish whether he was present before concluding that he was not available.

Because Davis's trial counsel did not object to the admission of Trey's testimony, our review of its admission is for plain error only. See OCGA § 24-1-103 (d). To establish plain error, an appellant must

point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Denson v. State*, 307 Ga. 545, 547-548 (837 SE2d 261) (2019) (citation and punctuation omitted). Importantly, "[t]he failure to meet one element of this test dooms a plain error claim." Id. at 548.

Davis's claim fails precisely for that reason: he cannot satisfy the first element of the plain error test because he affirmatively waived the alleged error he now enumerates. To constitute an affirmative waiver, an error must have been "intentionally relinquished or abandoned." *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011) (citation and punctuation omitted).[6] Here, Davis's trial counsel "intentionally relinquished" any objection to the trial court's Rule 804 ruling when he agreed with the State's Rule 804 analysis ("She's right, Judge.") and asked that all of Trey's previous

---

[6] Although *Kelly* addressed the plain error standard for jury charges, *Kelly*, 290 Ga. at 32-33, we held in *Gates v. State*, 298 Ga. 324, 327 (781 SE2d 772) (2016), that "the same plain-error standard that we adopted in *Kelly* with respect to jury charges also applies to rulings on evidence."

12

testimony—presumably as opposed to only excerpts—be admitted ("We just ask that [Jones's] entire testimony at the preliminary hearing be admitted."). Far from merely failing to object, trial counsel's actions constituted an affirmative waiver. See *Woodard v. State*, 296 Ga. 803, 809-810 (771 SE2d 362) (2015) (holding that trial counsel affirmatively waived an argument of error on appeal where counsel not only failed to object to the language in a proposed self-defense jury instruction, but also "requested that the trial court give the pattern charge including that language"). Compare *Cheddersingh v. State*, 290 Ga. 680, 684-685 (724 SE2d 366) (2012) (holding that trial counsel did not "intentionally relinquish" and thus did not affirmatively waive an alleged error on appeal where the trial court asked counsel, "Is the verdict form acceptable to the defense?", and counsel responded, "I believe so. Let me look at it one more time" but never made an objection). Because Davis's trial counsel "intentionally relinquished" any objection to the trial court's Rule 804 ruling on Trey's testimony, he affirmatively waived it, and so his claim of plain error fails. See *Denson*, 307 Ga. at 548.

13

3. Davis also argues that his trial counsel was constitutionally ineffective for failing to object to the admission of Trey Jones's prior testimony. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). Indeed, trial counsel's strategic or tactical decisions generally will not form the basis of an ineffective assistance of counsel claim unless they are "so patently unreasonable that no competent attorney

14

would have made it under the circumstances at the time." *Clark v. State*, 300 Ga. 899, 903 (799 SE2d 202) (2017) (citation and punctuation omitted). And if an appellant fails to prove either the deficiency or the prejudice prong of the *Strickland* test, we are not required to examine the other to determine that the claim of ineffective assistance fails. See *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010) ("If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.").

Here, Davis has failed to prove that trial counsel performed deficiently, so we reject his claim of ineffective assistance. As an initial matter, it is true that Davis's trial counsel testified at the hearing on Davis's motion for new trial that there was no strategic reason for failing to object when the State sought to read Trey's testimony into evidence. But the record undermines that claim. To that end, Davis's trial counsel admitted at the motion for new trial hearing that Trey's testimony was "important to demonstrate that. . . the victim went toward [Davis] in a quick fashion." In other words,

15

Trey's testimony was strategically useful to support Davis's theory of self-defense. Indeed, the record shows that Trey's testimony provided the jury with the primary evidence — other than Davis's own testimony — that Hoskins "did run up and try to grab" Davis immediately before Hoskins was stabbed. And even to the extent Trey's testimony that Davis "probably touched" Hoskins on the face before stabbing him was not favorable to the defense, that testimony did little, if anything, to undermine Davis's theory of self-defense or to otherwise harm his overall defense. Because reasonable trial counsel could have concluded that the favorable portions of Trey's testimony outweighed any harm from its admission, Davis has failed to show that trial counsel performed deficiently, and his claim of ineffective assistance of counsel therefore fails.

*Judgment affirmed. All the Justices concur.*

Decided April 5, 2021.

Murder. Richmond Superior Court. Before Judge Brown.

*J. Pete Theodocion*, for appellant.

*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.